Sherry PETROSKY, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES; William Achcet; Kenneth "Skip" Dwyer; Melvyn Milner; Dwight Schwabrow; David Harris; and George Hass, Defendants.

**No. 96–CV–0902 DRH.**

United States District Court,
N.D. New York.

Nov. 15, 1999.

---

40

Sheila Hilley, Albany, New York, for plaintiff.

Sue H.R. Adler, Albany, New York, for plaintiff.

Eliot Spitzer, Attorney General for the State of New York, Department of Law, Albany, New York (David B. Roberts, Assistant Attorney General, of counsel), for defendants.

## MEMORANDUM—DECISION AND ORDER

HOMER, United States Magistrate Judge.

Plaintiff Sherry Petrosky ("Petrosky") was formerly an employee of the New York State Department of Motor Vehicles ("DMV"). She brings this action against that agency as well as individual defendants William Achcet, Kenneth Dwyer, Melvyn Milner, Dwight Schwabrow, David Harris and George Hass[1] who served either as supervisors or co-workers of Petrosky at DMV. Her amended complaint (Docket No. 29)[2] asserts seven separate causes of action for discrimination as follows:

| Cause of Action | Legal Authority | Description |
|---|---|---|
| 1 | Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") | Sex discrimination |
| 2 | Title VII | Retaliation |
| 3 | Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") | Disability discrimination |
| 4 | 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment | Sex and disability discrimination |
| 5 | New York Human rights Law, N.Y.Exec.Law § 296 *et seq.* ("HRL") | Sex discrimination |
| 6 | HRL | Retaliation |
| 7 | HRL | Disability discrimination |

Petrosky seeks compensatory and punitive damages.

Defendants' have now moved pursuant to Fed.R.Civ.P. 56 for summary judgment.

1. The individual defendants will be referred to herein by their last names.

2. A second amended complaint was filed on June 9, 1999. Docket No. 60. That complaint was purportedly filed in response to this Court's order inviting the parties to make further submissions in light of a recently decided Supreme Court case addressing issues presented here. Docket No. 59. That order did not contemplate the filing of an amended complaint. Nor was the proposed amendment filed in accordance with Fed.R.Civ.P. 15(a) with respect to amendment of the pleadings. *See Colbert v. City of Philadelphia,* 931 F.Supp. 389, 393 (E.D.Pa.1996). The second amended complaint is, therefore, ordered stricken and this motion is addressed to the prior pleadings.

Docket No. 46. Petrosky opposes the motion. Docket Nos. 50–52. For the reasons which follow, defendants' motion is granted in part and denied in part.

## I. Background

On a motion for summary judgment, a court must view the facts in the light most favorable to the non-movant. *Joyce v. Curtiss–Wright Corp.*, 171 F.3d 130, 133 (2d Cir.1999). For purposes of the instant motion then, the facts alleged by Petrosky are accepted as true.

### A. Petrosky's Employment with DMV

Petrosky began work for DMV in August 1981 as a Motor Vehicle Investigator with DMV's Office of Field Investigation ("OFI"). Petrosky Aff. (Docket No. 50), ¶¶ 2 & 5. She was initially assigned to OFI's Albany office. *Id.* at ¶ 5. Her work as an investigator included "investigating license, registration and insurance fraud and odometer rollbacks and doing examinations of motor vehicles." *Id.* In the winter of 1986, Petrosky was reassigned to DMV's central office in Albany. *Id.* at ¶ 36. She remained there until the fall of 1987 when she returned to the OFI garage. *Id.* Her work as an investigator continued until May 18, 1994 when she took sick leave. *Id.* at ¶ 90. Petrosky's employment was terminated by DMV effective June 14, 1995. *Id.* at ¶ 100.

### B. Facts Relating to Gender Claim

The OFI office in Albany included an open area for vehicle inspections, an individual office for the supervisor and an office which was shared by the investigators, each of whom had their own desk. The office had a bulletin board and was adjacent to bathrooms jointly shared by all investigators, male and female. Petrosky Aff., ¶ 6. When she began her employment, Petrosky was told that her coworkers, all of whom were male, used foul language which she would have to tolerate. *Id.* at ¶ 9. The record reflects that coarse and vulgar language was a regular part of Albany's OFI garage. Much of the language used was sexually explicit. *Id.* at ¶ 15. Petrosky recites at length the use of "vulgar, lewd and offensive language" (*id.*) to discuss women (*id.* at ¶ 21), sex (Milner Dep. (Docket No. 52), p. 159) and her body parts (Petrosky Aff., ¶ 16).[3] On other occasions, though the language of her coworkers was not directed at her, Petrosky nonetheless heard it as a result of the small confines in which the investigators worked. Petrosky Aff., ¶ 15.

As noted, employees at Albany's garage shared a unisex bathroom. The lock on the door was broken. *Id.* at ¶ 17. Petrosky's co-workers told her she could leave the door open when she used the bathroom and assured her that no one would bother her. *Id.* She was also told that she could use the shower and that her fellow investigators would come in and soap her up. *Id.* There was a pinup of a naked woman in the bathroom "all the years" Petrosky worked in Albany and magazines with pictures of nude woman were in the bathroom as well. *Id.* Such magazines were also found regularly in the investigators' office. *Id.* at ¶ 18. Posters of nude or scantily clad women were located in the lockers of Petrosky's fellow investigators. *Id.* The lockers were frequently left open with the pictures readily in view. *Id.* Greeting cards containing sexually suggestive or explicit messages were often placed on Petrosky's desk or posted on the office bulletin board. *Id.* at ¶ 19 & Ex. A. On one occasion, a Polaroid picture was taken of Petrosky while she was underneath a car conducting an inspection. The picture, which showed only the lower half of her body, was placed on the bulletin board with the caption "OK guys I'm ready" written below it. *Id.* at ¶ 33 & Ex. C.

Petrosky complains of other allegedly discriminatory conduct aimed at her solely because of her gender. For example, more than once cars in which she was seated while performing inspections were raised on hydraulic lifts and she was left in

---

**3.** The citations provided are illustrative and not exhaustive.

**46**

the air for extended periods of time. *Id.* at ¶ 24. On another occasion, Petrosky's state issued vehicle was hidden from her by OFI investigators. When she discovered her car missing, Petrosky became upset and was warned by the investigators that having her car "stolen" like that could result in her termination. *Id.* at ¶ 26. Once when Petrosky returned to her office, she found her desk ringed with police tape and a dummy, dressed in her uniform, "stabbed" in the back with a letter opener. *Id.* at ¶ 27. This incident occurred at night and when Petrosky first saw the dummy, she started screaming, only to have another investigator call her on the telephone, say "Gotcha" and indicate that it had been a prank. *Id.* at ¶ 28.

In October 1994, Petrosky remained on sick leave but was called into work by Milner for the purpose of cleaning out her personal belongings. *Id.* at ¶ 92.[4] While she was there, Milner asked Petrosky where her handcuffs were. When she could not find them, Milner stated, "Don't kid me. I know that you and Jack [Petrosky's husband] have them hanging on your bedpost at home." *Id.* at ¶ 94. Milner then pulled Petrosky's handcuffs out of his desk. *Id.*

### C. Facts Relating to Disability Claim

In July 1987, Petrosky was diagnosed with Type II diabetes mellitus or brittle diabetes. Petrosky Aff., ¶ 39. Her doctor informed her that this type of diabetes usually appears in older individuals but that it may be induced earlier by stress. *Id.* She is treated with insulin but also is required to eat at regular intervals and take periodic breaks to manage her condition properly. *Id.* at ¶ 40. During her employment, Petrosky made four requests for reduced work hours. *Id.* at ¶ 41. The requests were made to permit her to take the structured breaks she needed and to avoid overtime work which would alter her schedule. *Id.* According to Petrosky, from

September 17 through November 12, 1987, her work hours were reduced by thirty percent. From November 12, 1987 through April 1, 1988, her hours were reduced twenty percent and she was not required to undertake overnight travel. She was assigned light duty from January 22 through April 1, 1990. However, on May 6, 1993, her hours were reduced twenty percent and Petrosky was excused from overnight travel. *Id.*

Despite the reduced work hours, Petrosky actually faced a heavier workload following her diabetes diagnosis. *Id.* at ¶¶ 42, 58 & 70. The added workload was the result of increased paperwork assignments and additional training duties. *Id.* at ¶¶ 43–44 & 70–71. At times the increased workload was such that Petrosky was unable to take any breaks or eat lunch. *Id.* at ¶ 71. Petrosky was also the subject of derogatory comments and complaints from co-workers who contended that they were required to do more work because of Petrosky's illness. *See, e.g., id.* at ¶¶ 43 & 52.

In March 1993, when Petrosky requested reduced hours, two of her supervisors, Achcet and Dwyer, complained about her request. *Id.* at ¶ 58. After that request, Petrosky was offered a clerical position at DMV's central office. *Id.* at ¶ 60. The job offer was made in a threatening manner. In particular, the suggestion was made that her diabetes raised questions about her ability to drive a state vehicle and that defendants would be in a better position to "watch" Petrosky at the central office. *Id.* at ¶ 61.

In 1992, the job description for OFI investigators changed to require firearms training. *Id.* at ¶ 78. While current investigators, such as Petrosky, were covered by a "grandfather" clause that did not require them to qualify with a weapon, *id.,* Petrosky sought to receive the training

4. The reason given was both that the garage was undergoing renovations and that DMV administrative officials were requiring additional inventories of equipment. Petrosky Aff., ¶ 92.

because she believed it would be necessary for any promotion. *Id.* at ¶ 79. Harris was then the range officer and when Petrosky spoke with him about the training, he refused to permit her to use the range and indicated that he would not aid her to be trained elsewhere. *Id.* at ¶ 80.

In September 1994, Petrosky was offered a Senior Investigator job. *Id.* at ¶ 90. Petrosky was told that the position required extensive travel to New York City which she indicated she would accept. *Id.* at ¶ 91. Dwyer, her interviewer, was surprised by this statement, had assumed she would not accept any job which required travel and had offered her the position simply to give the appearance that DMV was attempting to accommodate Petrosky. *Id.* When he learned that travel was acceptable, Dwyer administered an oral test to Petrosky, although no other applicant was administered a similar test. *Id.* at ¶ 91.

## II. Summary Judgment Standard

"Summary judgment ... is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1550, 143 L.Ed.2d 731 (1999) (citations omitted); *see also* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997). Once the movant has come forward with sufficient evidence in support of the motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Fed. R.Civ.P. 56(e); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir. 1994).

The trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 100 (2d Cir.1998); *see also Eastway Constr. Corp.*

*v. City of N.Y.,* 762 F.2d 243, 249 (2d Cir.1985). "Furthermore, the non-movant 'will have his allegations taken as true, and will receive the benefit of the doubt when his assertions conflict with those of the movant.'" *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996) (citations omitted).

When summary judgment is sought in gender discrimination cases, the Second Circuit has directed courts to consider such motions with extra caution. *See generally Gallagher v. Delaney,* 139 F.3d 338, 342–43 (2d Cir.1998). This is due in large measure to concerns about the rapidity with which notions of what constitutes sexual harassment are evolving and the fact sensitive nature of that analysis as it relates to issues of intent and state of mind. *Id.; Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) When appropriate, however, summary judgment "applies no less to Title VII cases than to commercial cases or other areas of litigation." *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998).

## III. Statute of Limitations

Defendants make the threshold argument that virtually all of the events underlying Petrosky's Title VII and ADA claims are untimely.

### A. Title VII

### 1. 300 Day Limitation Period

Title VII generally requires that an employee alleging workplace discrimination file a discrimination charge with the Equal Employment Opportunity Commission (EEOC) within 180 days of the allegedly unlawful conduct. 42 U.S.C. § 2000e–5(e)(1); *see also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir. 1998). However, "[a]n employment discrimination claim must be filed with the EEOC within 300 days of the alleged discrimination in a state, like New York, with a fair employment agency." *Pikulin v. City Univ. of N.Y.,* 176 F.3d 598, 599 (2d Cir.1999). It is not disputed that the 300 day period applies here. This period acts

as a statute of limitations, not a prerequisite to the exercise of jurisdiction. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Funk v. F & K Supply, Inc.*, 43 F.Supp.2d 205, 213 (N.D.N.Y.1999) (McAvoy, C.J.) (citing *Zipes*, 455 U.S. at 393, 102 S.Ct. 1127; *Quinn*, 159 F.3d at 765).

Petrosky filed an employment discrimination charge with the EEOC on March 20, 1995. Docket No. 46, Ex. B. Therefore, only those incidents of allegedly discriminatory conduct that occurred on or after May 23, 1994 are timely. The record is clear that only one incident that is arguably gender related occurred after that date. However, as a limitation period, the 300 day period is subject to certain exceptions. *Farrell v. State of N.Y.*, 946 F.Supp. 185, 192 (N.D.N.Y.1996) (McAvoy, C.J.); *Choi v. Chemical Bank*, 939 F.Supp. 304, 311 (S.D.N.Y.1996). Indeed, Petrosky does not contend that a standard other than the 300 day rule applies here or that more than one instance of harassment occurred within that period. Instead, she seeks to shelter the pre-May 1994 incidents under the protection of an exception to the statute of limitations known as the continuing violation doctrine.

## 2. The Continuing Violation Doctrine

■ "The continuing violation doctrine delays the point at which the statute of limitations begins to run. When a plaintiff experiences a 'continuous practice and policy of discrimination ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 331 (2d Cir.1997) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir.1994)); *see also Quinn*, 159 F.3d at 765–66. The doctrine is a "limited exception" to the statute of limitations. *Youssef v. M. Rosenblatt & Son, Inc.*, No. 91–Civ.–5063, 1992 WL 116633, at *3 (S.D.N.Y. May 18, 1992); *Scott v. Federal Reserve*

*Bank of N.Y.*, 704 F.Supp. 441, 450 (S.D.N.Y.1989).

■ The continuing violation doctrine is disfavored in this circuit. *See, e.g., Fitzgerald v. Henderson*, 36 F.Supp.2d 490, 501 (N.D.N.Y.1998) (McAvoy, C.J.) (citing cases); *Ryduchowski v. Port Auth. of N.Y. & N.J.*, No. 96–CV–5589, 1998 WL 812633, at *5 (E.D.N.Y. Nov. 19, 1998); *Sharkey v. Lasmo*, 992 F.Supp. 321, 334 (S.D.N.Y. 1998); *Samimy v. Cornell Univ.*, 961 F.Supp. 489, 494 (W.D.N.Y.1997). It, in fact, is applicable only under the most "compelling circumstances." *Amin v. Quad/Graphics, Inc.*, 929 F.Supp. 73, 80 (N.D.N.Y.1996); *see also McNight v. Dormitory Auth. of the State of N.Y.*, 995 F.Supp. 70, 79 (N.D.N.Y.1998) (McAvoy, C.J.); *Ryduchowski*, 1998 WL 812633, at *5; *Nicholas v. Nynex, Inc.*, 974 F.Supp. 261, 266 (S.D.N.Y.1997); *Samimy*, 961 F.Supp. at 494.

■ A continuing violation most commonly exists when "discriminatory acts [are] committed under an ongoing policy of discrimination." *Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir.1998). A continuing violation also may be shown "where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell*, 23 F.3d at 704; *see also Alfano v. Costello*, 940 F.Supp. 459, 470 (N.D.N.Y.1996) (Pooler, J.). Petrosky contends here that she was subjected to a fifteen year pattern of sexually harassing behavior of which DMV was fully aware, but about which it took no remedial action. She bears the burden of demonstrating that the doctrine applies on these facts. *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1303 (8th Cir.1997), *cert. denied sub nom. Oglebay Norton Co. v. Jenson*, —— U.S. ——, 118 S.Ct. 2370, 141 L.Ed.2d 738 (1998); *Dargento v. Bally's Holiday Fitness Ctrs.*, 990 F.Supp. 186, 196 (W.D.N.Y. 1997); *Williams v. Borough of Manhattan Community College*, No. 94–Civ.–4304,

1995 WL 495499, at *2 (S.D.N.Y. Aug. 18, 1995).

While the continuing violation doctrine is now well established, courts continue to wrestle with its application. *See, e.g., Rivera v. Puerto Rican Home Attendants Serv., Inc.,* 930 F.Supp. 124, 130 (S.D.N.Y. 1996); *see also* Ramona L. Paetzold & Anne M. O'Leary–Kelly, *Continuing Violations and Hostile Environment Sexual Harassment: When is Enough, Enough?,* 31 Am.Bus.L.J. 365, 382 (1993) (calling doctrine "one of the most confusing and inconsistently applied developments in employment discrimination law"). Indeed, while recognizing the availability of the doctrine in discrimination cases, the Second Circuit has not been "clear as to the criteria that determine when pre-limitation discriminatory acts cross the line from being unfortunate events in history which have no present legal consequences to being elements in a continuing violation." *Johnson v. Nyack Hosp.,* 891 F.Supp. 155, 163 (S.D.N.Y.1995), *aff'd,* 86 F.3d 8 (2d Cir.1996) (internal quotation omitted).

In *Berry v. Board of Supervisors of La. State Univ.,* 715 F.2d 971 (5th Cir.1983), the Fifth Circuit offered what to date constitutes the most comprehensive and specific standard for determining when a continuing violation has been established. *Berry* articulated three factors which, though not exhaustive, provide a focus for the issue.

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued exis-

tence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* at 981.

While the Second Circuit has never passed on its applicability here, *Berry* has been followed in the district courts of this circuit. *See, e.g., Brown v. Middaugh,* 41 F.Supp.2d 172, 181–82 (N.D.N.Y.1999) (Munson, J.) (citing cases); *Dodson v. The N.Y. Times Co.,* No. 97–Civ.–3838, 1998 WL 702277, at *3–4 (S.D.N.Y. Oct. 7, 1998); *Detrick v. H & E Machinery, Inc.,* 934 F.Supp. 63, 67 (W.D.N.Y.1996). At least two circuits have expressly adopted the *Berry* analysis as their own. *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481 (3d Cir.1997); *Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1415 (10th Cir.1993). Two others have cited *Berry* with approval, *Selan v. Kiley,* 969 F.2d 560, 566 (7th Cir.1992); *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33,* 921 F.2d 396, 402 (1st Cir.1990). District courts in circuits that have not adopted *Berry* have likewise applied it as the primary standard for determining the existence of a continuing violation. *See, e.g., Demuren v. Old Dominion Univ.,* 33 F.Supp.2d 469, 477 (E.D.Va.1999); *Villines v. United Bhd. of Carpenters & Joiners of Am., AFL—CIO,* 999 F.Supp. 97, 102 (D.D.C.1998); *Beasley v. Alabama State Univ.,* 966 F.Supp. 1117, 1129 (M.D.Ala. 1997); *Davis v. State of Cal. Dep't of Corrections,* No. S–93–1307, 1996 WL 271001, at *22 (E.D.Cal. Feb. 23, 1996); *Bell v. Chesapeake & Ohio Ry. Co.,* 724 F.Supp. 489, 491 (E.D.Mich.1989), *aff'd,* 929 F.2d 220 (6th Cir.1991); *Caudill v. Farmland Indus., Inc.,* 698 F.Supp. 1476, 1482–83 (W.D.Mo.1988), *aff'd,* 919 F.2d 83 (8th Cir. 1990). *Berry* represents a sound approach to the continuing violation issue and will be utilized here.

### a. Relatedness

The first *Berry* factor asks whether the allegedly discriminatory acts "involve the

same type of discrimination." *Berry*, 715 F.2d at 981; *Davis v. City Univ. of N.Y.*, No. 94–Civ.–7277, 1996 WL 243256, at *11 (S.D.N.Y. May 9, 1996). Existing Second Circuit authority would appear to suggest, however, that this factor should be given only limited weight. "[M]ultiple incidents of discrimination, *even similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir.1993) (emphasis added).

The vast majority of the conduct alleged by Petrosky is undeniably related. Most of the harassing conduct of which she complains was overtly sexual in content. *See* Part I(B) *supra.*[5] Often repeated sexually explicit remarks and gestures constitute related conduct for purposes of *Berry*. *White v. Midwest Office Technology, Inc.*, 5 F.Supp.2d 936, 943–44 (D.Kan.1998). Petrosky has alleged such conduct. Thus, the similarity of the conduct here favors finding a continuing violation. However, it must be accompanied by more to warrant invocation of the doctrine here. *Lambert*, 10 F.3d at 53.

**b. Frequency**

■ The second *Berry* factor considers the frequency with which allegedly discriminatory acts occur. *Berry*, 715 F.2d at 981; *Davis v. City Univ.*, 1996 WL 243256, at *11. This factor tests whether conduct is recurring rather than merely isolated or sporadic. *Waltman v. International Paper Co.*, 875 F.2d 468, 475 (5th Cir.1989); *Dodson*, 1998 WL 702277, at *4; *Blanchard v. Union Nat'l Life Ins. Co.*, No. 95–CV–218, 1996 WL 408069, at *3 (N.D.Miss. May 17, 1996). In the Second Circuit, courts have consistently considered not only the frequency but the regularity of the acts to be

an essential element in establishing a continuing violation. Acts which are isolated in time, from each other and from the timely allegations are insufficient to maintain the "continuum of discrimination" necessary for a continuing violation. *Quinn*, 159 F.3d at 766; *Osier v. Broome County*, 47 F.Supp.2d 311, 318 (N.D.N.Y.1999) (McAvoy, C.J.). Indeed, in this circuit no continuing violation exists "when the continuous and connected nature of the discriminatory acts is negated by a sufficient gap between the acts." *Davis v. City of Stamford*, No. 95–CV–2518, 1998 WL 849369, at *1 (D.Conn. Nov. 16, 1998) (citing *Annis*, 136 F.3d at 246).

The allegations contained in the amended complaint are discussed generally in Part I(B) *supra*. For purposes of this motion, these specific allegations are not generally disputed. *See* Defs. Rule 7.1 Statement. The allegations fall into one of three categories: those specific as to time those which provide only a range in time (e.g., "early 1980s"); and those which provide no specific frame of reference. The record contains allegations regarding specific conduct alleged to be discriminatory that occurred in 1981 through 1983, 1986–1988, 1990, and 1992 through 1994. No specific discriminatory event is alleged to have occurred in 1984, 1985, 1989, or 1991. Even in those years where specific allegations are made, no more than one or two events are specifically alleged to have occurred in any given year. Thus, there are several time periods ranging to years in length in which no specific discriminatory incident is alleged. These gaps would generally militate against finding a continuing violation here. *See Quinn*, 159 F.3d at 766; *Osier*, 47 F.Supp.2d at 318–19; *Davis v. City of Stamford*, 1998 WL 849369, at *1; *Hopkins v. Digital Equip. Corp.*, No.

---

5. Certain conduct complained of by Petrosky, however, does not appear gender based per se. This includes, for example, her allegations concerning the car lift. While these incidents do not demonstrate an overt gender based or sexually harassing character, it must be assumed, for purposes of this motion from

their overall context hat they are part and parcel of what Petrosky alleges was a workplace permeated by gender discrimination. *See Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993) (all reasonable inferences must be drawn in favor of non-movant).

93–Civ.–8468, 1998 WL 702339, at *3 (S.D.N.Y. Oct. 8, 1998).

That leaves Petrosky to rely solely on allegations of harassment which, while specific as to conduct, are general as to time. For example, she alleges that coarse and vulgar language was used constantly and that pornographic magazines were a regular fixture of her workplace. Petrosky Aff., ¶¶ 15 & 17–18. Viewed in the light most favorable to Petrosky, at least some of these general statement support her position that the conduct alleged was sufficiently frequent to satisfy this requirement of *Berry*. For example, she affirms that vulgar and lewd language was used "constantly" (Petrosky Aff., ¶ 15) and comments about her breast size were made "[a]lmost every week" (*id.* at ¶ 16). Additionally, it appears from the record that she was regularly exposed to magazines and posters of nude women. *Id.* at ¶¶ 17–18.

These allegations are sufficient for purposes of the pending motion to determine that at least some of the conduct at issue was "frequent" for purposes of the *Berry* analysis.

### c. Degree of Permanence

The final *Berry* factor asks whether the acts have the "degree of permanence which should trigger an employee's awareness and duty to assert his or her rights." *Berry*, 715 F.2d at 981; *see also Davis v. City Univ.*, 1996 WL 243256, at *11 ("does the act have that degree of permanence that ought to have made the employee aware that the time to assert her rights had arrived?"). This factor is the most important in the *Berry* analysis. *Berry*, 715 F.2d at 981; *see also Alldread v. City of Grenada*, 988 F.2d 1425, 1432 (5th Cir.1993); *Sabree*, 921 F.2d at 402; *Johnson*, 891 F.Supp. at 164 (citing cases). This factor acts essentially as a notice requirement. When discriminatory acts are of such a duration and form as to place the employee on notice of their discriminatory effect, a duty is created to assert

one's rights. *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 537–38 (5th Cir.1998); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir.1996); *Desrosiers v. Great Atl. & Pac. Tea Co., Inc.*, 885 F.Supp. 308, 312 (D.Mass.1995) (citing cases). The Second Circuit has also recognized this duty to act of an employee who is on notice of a discrimination claim. *Pollis v. New Sch. for Social Research*, 132 F.3d 115, 119 (2d Cir.1997) ("The statute of limitations requires that such claims be brought promptly to protect the defendant against stale or fabricated claims.").

In addition, the Seventh Circuit has identified the important role notice plays in determining whether the continuing violation doctrine is properly asserted. *See, e.g., Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395–97 (7th Cir.1999); *Minor v. Ivy Tech State College*, 174 F.3d 855, 857–58 (7th Cir.1999). At the heart of the Seventh Circuit's view of the doctrine is a reluctance to permit reliance on the doctrine when plaintiffs were earlier aware of their claim but chose to wait before filing suit. *See Galloway*, 78 F.3d at 1167.

> [T]he continuing violation doctrine has delineated limits. Where a pattern of harassment spreads out over years, and it is evident long before the plaintiff sues that she was a victim of actionable harassment, she cannot reach back and base her suit on conduct that occurred outside the statute of limitations. While a single comment may not be harassment, if the comment is repeated over a period of years, its cumulative effect likely precludes invocation of the doctrine.

*Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir.1999) (citation and internal quotations omitted). Other courts have also emphasized that longstanding notice of a claim may preclude resort to the continuing violation doctrine. *See, e.g., Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 166 (1st Cir.1991); *Dupont–Lauren v. Schneider (USA), Inc.*, 994 F.Supp. 802,

816 (S.D.Tex.1998). The Second Circuit appears to agree. In restating the principle that a discrimination claim accrues when the plaintiff has notice of the discrimination, the court has noted that "[t]here is no reason to defer the accrual of her claim to the time she received notice of all discrete acts that might make up her discrimination claim." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996).[6]

Thus, the question becomes if and when Petrosky was on notice that she may be the victim of workplace discrimination. This inquiry necessarily involves asking when a layperson, not trained in the law, would have been aware of her right and duty to assert her legal claim. Such an inquiry is especially difficult in a hostile work environment case for two reasons. *See generally When is Enough, Enough?*, 31 Am.Bus.L.J. at 386. First, "the law of sexual harassment continues to develop at a brisk pace." *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir.1994). This fact must be considered in assessing a lay plaintiff's awareness of a claim. Second, "[t]he creation of a hostile work environment by ... sexual harassment is a different kind of working condition because the beginning and end of such working conditions is not as readily apparent." Mark A. Rothstein, et al., *Employment Law*, § 3.26, p. 247 (1994). While a single incident of harassment may suffice to create a hostile work environment, such claims generally are proven through a pervasive pattern of conduct. *See Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436–37 (2d Cir.1999); *Torres v. Pisano*, 116 F.3d 625, 631 n. 4 (2d Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *Badlam v. Reynolds Metals Co.*, 46 F.Supp.2d 187, 194–95 (N.D.N.Y.1999) (McAvoy, C.J.). Therefore, a plaintiff who sues too soon runs the risk of having filed suit before the conduct can be deemed sufficiently pervasive, while a plaintiff who waits risks having early incidents deemed untimely. *See Galloway*, 78 F.3d at 1166–67. However, the "mere incantation of claims of hostile work environment will not be enough to invoke the continuing violation doctrine." *Brown*, 41 F.Supp.2d at 182.

The record here demonstrates that Petrosky was indeed on longstanding notice of what she believed was workplace discrimination based on her gender. Petrosky complained to DMV officials "[b]ecause of the harassment" as early as the "mid–1980s." Petrosky Aff., ¶ 29. At that time she contacted a person in the DMV training department to explore whether a position outside of OFI might be available. She indicated she was looking for a new job because of "the hostile environment at the garage." *Id.* She took no legal actions to protect her rights at that time.[7] In February 1990, Petrosky "told Achcet in detail about the hostility and harassment [she] was subjected to as a woman." *Id.* at ¶ 53. Again, in approximately March 1993, Petrosky told officials in the DMV Affirmative Action office "the details of the sexual harassment and gender discrimination" to which she had been subjected. *Id.* at ¶ 63. Still, she took no legal action.[8]

---

**6.** This approach comports with the well established rule that a cause of action accrues when the plaintiff is on notice of the act that allegedly injured her. *Delaware State College v. Ricks*, 449 U.S. 250, 259, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *see also Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir.1980) (under federal law claim accrues for limitations purposes when the plaintiff knew or should have known of the availability of the claim).

**7.** This time frame is vague and it is arguable that this complaint was made prior to the Supreme Court's recognition of hostile work environment claims. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The relevant test for purposes here, however, is not whether Petrosky knew that the claim would be meritorious but whether she "knew [s]he was being sexually harassed." *Bolt v. Norfolk Southern Corp.*, 22 F.Supp.2d 512, 517 (E.D.Va.1997).

**8.** Petrosky's affidavit indicates that she made complaints on other occasions as well in response to specific acts of harassment. *See* Petrosky Aff., ¶¶ 35, 49, 51 & 67.

At her deposition Petrosky testified further about the scope of her knowledge of the alleged discrimination. She testified that after her brief transfer to the DMV Central Office after January 1986, she told Achet and another individual that she had encountered a hostile work environment at the Albany OFI garage. Petrosky Dep., Vol. I (Docket No.47), pp. 90–91. She testified that she had told Achcet about the "hostile work environment" as early as 1983 and again in 1990. *Id.* at pp. 130 & 165. "This testimony indicates actual knowledge of perceived discriminatory treatment or at least sufficient notice to alert" Petrosky of her claim. *Dupont–Lauren,* 994 F.Supp. at 816. Petrosky's failure to act in preservation of her rights in spite of her knowledge of this harassment weighs strongly against permitting her now to rely on a continuing violation. *Yoho v. Tecumseh Prod. Co.,* 43 F.Supp.2d 1021, 1026–27 (E.D.Wis.1999); *Welch v. Cook County Clerk's Office,* 36 F.Supp.2d 1033, 1040 (N.D.Ill.1999). Indeed, where, as here, a plaintiff "knew from the beginning that [s]he was being sexually harassed," the continuing violation doctrine does not apply. *Bolt,* 22 F.Supp.2d at 517.

Petrosky, therefore, was on notice of the basis for the instant claim as early as 1983 and on several other occasions between then and the time she filed her EEOC charge, but failed to act until 1995.[9] This requires that the third and most important *Berry* factor be weighed against her.

### 3. Conclusion

Research has revealed no cases in which fifteen years of allegedly discriminatory conduct was held to fall within the continuing violation doctrine. There is abundant authority, however, for the proposition that an employee on clear notice of what she contends is an illegally discriminatory workplace cannot wait even three years before filing suit and then seek to shelter earlier claims under the continuing violation doctrine. In this case,

> the alleged discriminatory acts appear to have gone on for a relatively long time in a fairly frequent manner, indicating that plaintiff[ ] should have become aware that [defendants] might have been unlawfully discriminating against [her]. These activities ... should have triggered plaintiff['s] awareness of violations of [her] rights. There is no continuing violation and plaintiff[ ] cannot now require [defendants] to defend claims arising from employment practices that are long past.

*Kopystecki v. Quality Books, Inc.,* No. 92–C–1742, 1992 WL 345037, at *4 (N.D.Ill. Nov. 12, 1992) (rejecting continuing violation claim for conduct which occurred over three year period). Here, Petrosky demonstrated actual knowledge that she was being harassed. Thus, while the other factors support Petrosky's argument, the most significant *Berry* factor, notice, weighs strongly against Petrosky's continuing violation claim. Given the lengthy duration of her knowledge here and the greater weight accorded this factor, it is dispositive in the circumstances of this case. Petrosky's invocation of the doctrine is therefore rejected and all pre-May 23, 1994 gender-based conduct is time barred.

Any other result is contrary to the clear intent and purpose of the relatively short limitations period that applies in Title VII cases. That brief period permits defendants an opportunity to consider claims while they are fresh. *Ruffino v. State Street Bank & Trust Co.,* 908 F.Supp. 1019, 1037 (D.Mass.1995) (citing *Kale v. Combined Ins. Co. of Am.,* 861 F.2d 746, 753 (1st Cir.1988)); *Lewis,* 874 F.Supp. at 1303; *see also Farnum v. Swiss Bank Corp.,* No. 85–Civ.–157, 1986 WL 1172, at *1 (S.D.N.Y. Jan. 23, 1986) ("primary purpose" of 300 day limitation period is to bar "stale" claims). This intent is given force

---

9. Petrosky's own memorandum of law in opposition to the motion concedes that she "complained to Achcet in 1983, 1986, 1989, 1990 and 1993." Pl.Mem. of Law (Docket No. 51), p. 17.

by circumscribed and searching application of the doctrine. The doctrine, a limited exception to the statute of limitations, cannot be applied to destroy the protections of the statute of limitations. *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907–08 (2d Cir.1997); *see also Lewis v. Board of Trustees of Ala. State Univ.,* 874 F.Supp. 1299, 1303 (M.D.Ala.1995) ("The continuing violation doctrine does not exist to ·give an employee who allowed a legitimate claim to lapse a second chance to file the claim."). Petrosky's substantial delay here precludes reliance on the continuing violation doctrine.

### B. ADA

■ The ADA took effect July 26, 1992. *Smith v. United Parcel Serv. of Am., Inc.,* 65 F.3d 266 (2d Cir.1995); *Velardi v. New York City Fire Dep't Pension Fund,* 20 F.Supp.2d 623, 625 (S.D.N.Y. 1998), *aff'd,* 182 F.3d 902, 1999 WL 377085 (2d Cir.1999). It does not apply retroactively. *Id.* As a result, no conduct which occurred prior to July 26, 1992 is actionable in this case. Therefore, Petrosky is limited for purposes of her ADA claim to conduct occurring on or after that date.

The same 300 day limitations period that applies to Petrosky's Title VII claim also applies to her ADA claim. *Harris v. City of N.Y.,* 186 F.3d 243, 250 n. 5 (2d Cir. 1999); *Valentine v. Standard & Poor's,* 50 F.Supp.2d 262, 280 (S.D.N.Y.1999); *Cable v. New York State Thruway Auth.,* 4 F.Supp.2d 120, 124 (N.D.N.Y.1998) (McAvoy, C.J.). The cutoff day for these claims, therefore, is the same May 23, 1994 date as that for her Title VII claim. The continuing violation doctrine Petrosky seeks to invoke for her Title VII claim is equally applicable to claims brought pursuant to the ADA. *See* Rothstein, et al., *Employment Law,* § 3.38, p. 49 (Supp. 1997). The same standards govern application of the doctrine under each statute. *See Cordle v. Tropicana Prod., Inc.,* No. 94–1835, 1997 WL 118433, at *5 (M.D.Fla. Feb. 20, 1997); *Simmons v. Contel/GTE Corp.,* No. 94–C–50040, 1994 WL 376274, at *3 (N.D.Ill. July 18, 1994).

The continuing violation doctrine, however, cannot extend coverage of the ADA back to pre-July 26, 1992 claims because any such conduct was not actionable under the ADA at the time it was committed. *Tschida v. Ramsey County,* 927 F.Supp. 337, 341 (D.Minn.1996), *aff'd,* 108 F.3d 1382, 1997 WL 91448 (8th Cir.1997); *Morton v. GTE North, Inc.,* 922 F.Supp. 1169, 1177 (N.D.Tex.1996), *aff'd,* 114 F.3d 1182 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 205, 139 L.Ed.2d 141 (1997); *Miller v. CBC Co. Inc.,* 908 F.Supp. 1054, 1063–64 (D.N.H.1995). Therefore, regardless of the limitations period and any applicable exceptions to it, no conduct of defendants prior to July 26, 1992 affords any basis for liability to Petrosky under the ADA.

■ Applying the same standards discussed in Part III(A)(2) *supra,* Petrosky has demonstrated her entitlement to invoke the continuing violation doctrine with respect to her ADA claim. Her assertions regarding disability discrimination are related, as all concern either her work schedule or her qualifications. As to frequency, Petrosky alleges a continuous course of conduct which suffices to establish the necessary "continuum of discrimination." *See Green,* 159 F.3d at 766, *Osier,* 47 F.Supp.2d at 319.

The final consideration is the degree of permanence or notice factor. While Petrosky was clearly on notice of her Title VII claim long before she commenced any legal action, the same cannot be said of her disability claim. The ADA remedy was not available until July 1992. Less than two years later, Petrosky began the process of seeking legal recourse by filing an administrative discrimination complaint with DMV's affirmative action office. Docket No. 46, Ex. A. In March 1995, she filed a complaint with the EEOC. *Id.* at Ex. B. No record evidence suggests that she was on explicit notice of disability discrimination prior to that time. Thus,

there is no evidence that she delayed seeking relief and the factors that ultimately defeat her attempt to invoke the continuing violation doctrine on her Title VII claim are absent here.

Petrosky has alleged related, regular discriminatory conduct sufficient under *Berry* to establish a continuing violation. As a result, the continuing violation doctrine applies and renders all alleged post-July 26, 1992 conduct timely and actionable.

## C. Section 1983

 Section 1983 claims are governed by state statutes of limitations. *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). In New York, such claims are governed by the general three year personal injury limitations period. *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir.1997); *see also* N.Y.Civ.Prac.L. & R. § 214(5) (McKinney 1990). Accrual of the claim, however, is a question of federal law. *Ormiston*, 117 F.3d at 71; *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir.1994). This action was commenced on June 5, 1996. Accordingly, all conduct occurring within three years of that date is timely for purposes of Petrosky's section 1983 claims.

The applicability of the continuing violation doctrine to section 1983 civil rights actions is unclear. The doctrine is largely a creature of Title VII employment discrimination law and courts have been reluctant to apply it outside that context. *See LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n. 3 (6th Cir.1995); *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 866 n. 27 (5th Cir.1993); *Oyler v. Finney*, 870 F.Supp. 1018, 1023 (D.Kan.1994) (citing cases), *aff'd*, 52 F.3d 338, 1995 WL 225270

(10th Cir.1995); *but see Gutowsky v. County of Placer*, 108 F.3d 256, 259 (9th Cir.) (applying doctrine to section 1983 case), *cert. denied*, 522 U.S. 914, 118 S.Ct. 298, 139 L.Ed.2d 229 (1997); *Redding v. Anne Arundel County*, 996 F.Supp. 488, 490–91 (D.Md.1998) (suggesting doctrine applies); *Bremiller v. Cleveland Psychiatric Inst.*, 879 F.Supp. 782, 790 (N.D.Ohio 1995) (applying doctrine).

In this circuit, the question has received little treatment. In *Cornwell v. Robinson*, 23 F.3d at 704, the Second Circuit applied the doctrine to a section 1983 claim without any discussion. *See Kim v. Dial Serv. Int'l, Inc.*, No. 96–Civ.–3327, 1997 WL 5902, at *5 (S.D.N.Y. Jan. 8, 1997). It must be concluded from *Cornwell*, however, that the doctrine applies to section 1983 claims in this circuit. Applying the same analysis used above, Petrosky has established a continuing violation with respect to her disability but not her gender claim under section 1983.[10]

## D. New York Human Rights Law

Petrosky's claims under the state HRL are governed by a three year statute of limitations. N.Y.Civ.Prac.L. & R. § 214(2) (McKinney 1990); *Fern v. International Bus. Mach., Corp.*, 204 A.D.2d 907, 612 N.Y.S.2d 492, 493 (3d Dep't 1994). Thus, as with Petrosky's claims under section 1983, any conduct within three years of commencement of this action is timely. It appears that New York courts apply the same analysis as federal courts in applying the continuing violation doctrine. *See Walsh v. Covenant House*, 244 A.D.2d 214, 664 N.Y.S.2d 282, 283 (1st Dep't 1997) (citing federal court cases). For the reasons set forth above, therefore, the · doctrine does not apply to Petrosky's claims regarding gender discrimination but does apply to her state law disability claims.

---

**10.** Petrosky's ADA claim concerns only events occurring after the enactment of the statute. Section 1983 is not of such recent vintage. There is no evidence suggesting longstanding notice of discrimination against Petrosky based on her disability and, accordingly, all disability related events are actionable and timely with respect to the section 1983 claim.

## IV. Merits of Petrosky's Claims

Defendants also seek summary judgment on the merits of Petrosky's claims.

### A. Gender Claims

In her first, fourth and fifth causes of action, Petrosky alleges that she was the victim of sexual harassment in violation of Title VII, the Equal Protection Clause of the Fourteenth Amendment and the HRL respectively. It is now beyond peradventure that sexual harassment is a form of prohibited gender discrimination. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1002–03, 140 L.Ed.2d 201 (1998); *Meritor Sav. Bank, FSB. v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998). Sexual harassment itself may take two forms: quid pro quo harassment and harassment based on a hostile work environment. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2264–65, 141 L.Ed.2d 633 (1998); *Meritor,* 477 U.S. at 64–65, 106 S.Ct. 2399; *Distasio,* 157 F.3d at 61. Petrosky asserts hostile work environment as the basis for her statutory claims.

For purposes of defendants' motion here, the legal standard which governs claims of sexual harassment based on a hostile work environment under Title VII also governs such claims asserted under both the Equal Protection Clause, *see Wise v. New York City Police Dep't,* 928 F.Supp. 355, 367 (S.D.N.Y.1996) (citing cases); *Reynolds v. Atlantic City Convention Ctr. Auth.,* No. 88–Civ.A.–4232, 1990 WL 267417, at \*16 (D.N.J. May 26, 1990), *aff'd,* 925 F.2d 419 (3d Cir.1991); *Shinault v. City of Chicago,* No. 84–C–2009, 1987 WL 16902, at \*2 (N.D.Ill. Sept. 8, 1987); and the HRL, *see Pace v. Ogden Servs. Corp.,* 257 A.D.2d 101, 692 N.Y.S.2d 220, 223 n. 1 (3d Dep't 1999). As discussed above in Part III, the statutes of limitations applicable to these three causes of actions dif-

fer. Thus, under the Title VII claim, only those acts occurring on or after May 23, 1994 may be considered while under the Equal Protection Clause and HRL claims, those acts occurring on or after Jun 5, 1993 may be considered.

As noted above, Petrosky has offered a plethora of evidence supporting her gender discrimination claims dating back to the early 1980s. However, the facts asserted by Petrosky in support of those claims which occurred after June 5, 1993 are limited to the following. First, on October 20, 1994, Petrosky was called into work from sick leave by Milner to remove her personal belongings. When Petrosky could not locate her handcuffs, Milner stated, "Don't kid me. I know that you and Jack [Petrosky's husband] have them hanging on your bedpost at home." Milner then pulled Petrosky's handcuffs out of his desk. Petrosky Aff., ¶¶ 92–94.

Second, Petrosky asserts ongoing conduct which she contends affected the environment of the workplace. In most instances, however, the evidence offered to establish that conduct fails to establish the dates of the conduct and, particularly, whether that conduct continued for any period after June 5, 1993. As noted above, that evidence must be viewed in the light most favorable to Petrosky as the non-moving party and Petrosky bears the burden of establishing an issue of fact as to such conduct. Accordingly, the evidence of ongoing conduct is considered here to the extent that Petrosky has offered any evidence that such conduct continued to any point after June 5, 1993.

This ongoing conduct consists of a poster of a topless woman on the wall of one bathroom, pictures of naked women in the lockers of male co-workers, the playing of a radio program in the garage to which Petrosky objected, and offensive comments by co-workers to Petrosky or in her presence.[11] The poster on the bathroom wall

---

11. Petrosky also offers evidence that male co-

workers maintained magazines such as *Play-*

depicted actress Bo Derek topless in a scene from the movie *Tarzan.* Wilkinson Dep., pp. 95–96; Petrosky Aff., ¶ 17. There were three bathrooms available to office employees and all three were used by both men and women. The bathroom containing the poster was located off the garage area on the first floor, a second bathroom was located in the waiting room area used by the public on the first floor, and a third was located on the second floor. Milner Dep., p. 54. The poster remained in the bathroom during Petrosky's entire time there. Petrosky Aff., ¶ 17.

At least three of Petrosky's male co-workers kept pictures of naked women attached to the inside of the doors of their lockers in a locker room shared with Petrosky. Petrosky Aff., ¶ 18; Petrosky Dep., p. 114. The locker doors were usually left open. Petrosky Aff., ¶ 18. The pictures remained in the lockers of co-workers at least into 1994. Petorsky Aff., ¶ 84.

Finally, Petrosky's co-workers "constantly" used vulgar, lewd and offensive language in her presence at the garage. Petrosky Aff., ¶ 15. This language included references to female body parts, sexual acts and women generally. *Id.* Co-work-

ers also made direct comments to Petrosky "almost every week" and "incessantly" disparaging and ridiculing her body. *Id.*, ¶ 16. These comments included references to the size of Petrosky's breasts and other aspects of her body.[12]

A hostile work environment "is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted); *see also Distasio*, 157 F.3d at 62. A hostile work environment plaintiff must show that her workplace was both objectively and subjectively hostile or abusive. *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 268 (2d Cir.1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S.Ct. 367). It must, therefore, have been such that a reasonable person would view the environment as hostile or abusive and the plaintiff must actually have viewed it as such. *Id.; Christopher–Ketchum v. Agway Energy Prod.*, 988 F.Supp. 610, 616 (N.D.N.Y.1997) (McAvoy, C.J.). Whether a hostile work environment exists can be determined only upon viewing the totality of the circum-

*boy* and *Penthouse* in the office which contained pictures of naked women, Petrosky Aff., ¶ 17; Wilkinson Dep. (Docket No. 52), pp. 96–98; her co-workers read those magazines at their desks and elsewhere in the office and frequently left the magazines on desks and tables after doing so, Petrosky Aff., ¶ 17; and also kept playing cards and pens in the office which bore pictures of nude women, *id.*, ¶ 55; displayed doodle pads with body parts sketched on them on their desks, *id.*; and her co-workers occasionally took lunchtime trips to a pornography shop in nearby Schenectady or watching pornographic slides in the supervisor's office, *id.* Petrosky neither alleges when these events occurred nor any basis for concluding that these events continued after June 5, 1993. *Compare, e.g.*, Petrosky Aff., ¶¶ 15 (use of vulgar language was "constant") & 16 (comments about Petrosky's body by co-workers occurred "almost every week"). Moreover, the only evidence in the record establishing when such conduct oc-

curred suggests it ended in 1992. *See* Milner Dep. (Docket No. 52), p. 172–73 & 177 (conduct occurred "in prior years" and while co-worker Wilkinson was employed there); Wilkinson Dep., p. 18 (Wilkinson departed office in June 1992); Petrosky Aff., ¶¶ 54–56 (paragraph 55 of plaintiff's affidavit containing many of these assertions omits any reference to time but is presented in the affidavit, otherwise presented chronologically, between paragraphs describing events in 1991 and October 1992). Thus, Petrosky has failed to offer any evidence that any of these events occurred after June 5, 1993 and none will be considered on this motion.

12. Petrosky also asserts that her co-workers insisted on listening to the "Howard Stern Show," a radio program to which Petrosky objected because it "was full of sexual innuendo and degrading comments about women." Petrosky Aff., ¶ 51.

stances. *Harris v. Forklift Sys., Inc.*, 510 U.S. at 23, 114 S.Ct. 367; *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Relevant factors include the frequency and severity of the harassing conduct, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. at 23, 114 S.Ct. 367; *Distasio*, 157 F.3d at 62.

■ "Pervasiveness and severity are independent and equal grounds on which to support violations of Title VII." *Roman v. Cornell Univ.*, 53 F.Supp.2d 223, 243 (N.D.N.Y.1999) (McAvoy, C.J.); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. at 21, 114 S.Ct. 367 (conduct must be "severe *or* pervasive") (emphasis added). As the Second Circuit has recently stated:

> Isolated, minor acts or occasional episodes do not warrant relief.... A plaintiff need not present a list of specific acts.... However, a plaintiff must still prove that the incidents were "sufficiently continuous and concerted," to be considered pervasive, ... or that a single episode is "severe enough" to establish a hostile working environment....

*Brennan v. Metropolitan Opera Assoc., Inc.*, 192 F.3d 310, 318 (2d Cir.1999) (internal citations omitted).

Here, of course, the October 1994 incident alone will not suffice to support Petrosky's hostile work environment claims. *See Brennan*, 192 F.3d at 318 ("one episode of ['lewd banter'] ... does not, by itself, establish a pervasively hostile atmosphere"). Petrosky's Title VII claim in her first cause of action is limited to acts

occurring on or after May 24, 1994. *See* Part III(A) *supra.* Petrosky took sick leave beginning May 18, 1994. Petrosky Aff., ¶ 90. Thus, because Petrosky was present at her work site after May 24, 1994 only for the single incident on October 20, 1994, she has failed to assert facts sufficient to support that claim and defendants' motion as to the Title VII claim is granted.

■ Nor would the October 20, 1994 incident in combination with the poster in the bathroom or the pinups in the lockers for prolonged periods likely suffice to support Petrosky's other two sex discrimination claims. *See Brennan*, 192 F.3d at 318-19 (single incident of lewd banter plus prolonged exposure to photographs on an office bulletin-board of nude and partially clothed men insufficient to establish hostile work environment for female employee).[13] In addition to this evidence, however, there is present here evidence that between June 6, 1993 and May 18, 1994, Petrosky was subjected to lewd and vulgar comments from co-workers, known to but unaddressed by supervisors, concerning both Petrosky personally and women generally, and that such comments occurred constantly throughout this period. This evidence suffices to create a triable issue of fact on Petrosky's Equal Protection and HRL hostile work environment claims. *See Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir.1997) (evidence of constant harassment sufficient to defeat motion for summary judgment even where plaintiff could not recall details of many incidents); *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009-11 (7th Cir. 1994); *Lipsett v. University of Puerto*

---

**13.** In *Brennan*, a female employee alleged that the "sexually provocative pictures of nude and partially clothed men that a male co-worker put up" plus a single incident of banter established the hostile environment. 192 F.3d at 318. The district court granted summary judgment to the defendant in part on the ground that plaintiff had failed to satisfy her burden of demonstrating that the photographs of the men were more offensive to women than to men and therefore failed to establish conduct based on gender. *Id.* The Second Circuit, however, affirmed solely on the ground that "no juror could rationally find that these pictures created a pervasive atmosphere of 'intimidation, ridicule and insult' adequate to alter the terms of the plaintiff's employment." *Id.* at 319 (citation omitted). The gender of those depicted in the photographs, therefore, was not a determining factor in the court's conclusion.

*Rico,* 864 F.2d 881, 905 (1st Cir.1988); *Badlam,* 46 F.Supp.2d at 195–96. .

Accordingly, defendants' motion for summary judgment on Petrosky's first cause of action is granted. That motion is denied on Petrosky's fifth causes of action and on her fourth cause of action based on gender discrimination.

## B. Disability Claims

In her third, fourth and seventh causes of action, Petrosky alleges that she was the victim of disability discrimination in violation of the ADA, the Equal Protection Clause of the Fourteenth Amendment and the HRL respectively.

### 1. ADA and HRL

"The ADA prohibits an employer from discriminating against an employee 'because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees'." *Lyons v. Legal Aid Soc'y,* 68 F.3d 1512, 1514 (2d Cir.1995) (quoting 42 U.S.C. § 12112(a)). Discrimination includes the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The standards applicable to claims under the ADA also govern claims under the HRL. *See Adams v. Rochester Gen. Hosp.,* 977 F.Supp. 226, 237 (W.D.N.Y.1997) (citing cases).

A plaintiff bears the initial burden of making a prima facie showing of disability discrimination. *Wernick v. Federal Reserve Bank,* 91 F.3d 379, 383 (2d Cir.1996); *Dollinger v. State Ins. Fund,* 44 F.Supp.2d 467, 478 (N.D.N.Y.1999) (McAvoy, C.J.). The necessary prima facie case requires Petrosky to demonstrate that 1) DMV was subject to the ADA and the HRL; 2) she is a person with a disability within the meaning of the statutes; 3) she could perform the essential functions of her job with or without accommodation; and 4) her adverse employment action occurred because of her disability. *Reeves v. Johnson Controls World Servs., Inc.,* 140 F.3d 144, 149 (2d Cir.1998); *Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869–70 (2d Cir.1998); *Dollinger,* 44 F.Supp.2d at 478.

Defendants here do not challenge Petrosky's ability to satisfy the first and second elements. It is assumed, therefore, that Petrosky has satisfied both elements.[14] The third element of the prima facie case concerns whether Petrosky was "otherwise qualified" for her job at DMV. An "otherwise qualified" individual is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position she holds or desires." 42 U.S.C. § 12111(8); *see also Sutherland v. New York State Dep't of Law,* No. 96–Civ.–6935, 1999 WL 314186, at *7 (S.D.N.Y. May 19, 1999).

Defendants initially contended that Petrosky was estopped from arguing that she was "otherwise qualified" because she had applied for and received workers compensation benefits claiming that she was totally disabled from her job. Defs.Mem. of Law (Docket No. 49), pp. 20–21 (citing cases). In *Cleveland v. Policy Management Sys. Corp.,* the Supreme Court held that a Social Security claimant's statement that she was totally disabled neither estopped nor raise a presumption against an ADA claim that the claimant was "otherwise qualified" for a particular position. 526 U.S. 795, 119 S.Ct. 1597, 1600, 143 L.Ed.2d 966 (1999). In light of *Cleveland,* the parties were invited to submit additional briefing on the point. Docket No. 59. Defendants have now indicated that

---

**14.** Defendants do not contest that Petrosky's Type II diabetes constitutes a disability within the meaning of the act. *Compare Epstein v. Kalvin–Miller Int'l, Inc.,* 21 F.Supp.2d 400, 404 (S.D.N.Y.1998) (Type II diabetes a disability) *with Pate v. Baker Tanks Gulf South, Inc.,* 34 F.Supp.2d 411, 416 (W.D.La.1999) (Type II not a disability); *see also Sutton v. United Air Lines,* 527 U.S. 471, 119 S.Ct. 2139, 2147 & 2151, 144 L.Ed.2d 450 (1999) (questioning when and if diabetes qualified as disability). It will be assumed here, therefore, that Type II diabetes is a qualifying disability.

they "will no longer press" their estoppel argument. Defs. Supplemental Mem. of Law (Docket No. 63), p. 2.

■ Defendants contend, however, that they reasonably accommodated Petrosky, she was still unable or unwilling to perform the essential functions of her job, and she thus was not "otherwise qualified." Defs.Mem. of Law, pp. 21–23. An essential element of Petrosky's claim is that she could work, either with or without accommodation, and that the accommodations sought were reasonable. *Bonitch v. The Original Honey Baked Ham Co. of the East, Inc.*, 34 F.Supp.2d 154, 159 (E.D.N.Y.1999). She contends that she was capable of working if accommodated with reduced hours and altered work schedules which permitted her to take regular breaks.[15]

■ Defendants suggest that they made every reasonable effort to accommodate Petrosky and thus are entitled to judgment as a matter of law. The reasonableness of accommodations is generally a question of fact, however. *Haschmann v. Time Warner Entertainment Co., LP*, 151 F.3d 591, 601 (7th Cir.1998); *Darian v. University of Mass., Boston*, 980 F.Supp. 77, 88 (D.Mass.1997); *Aquinas v. Federal Express Corp.*, 940 F.Supp. 73, 79 (S.D.N.Y.1996). Viewed in the light most favorable to Petrosky, the accommodations made here by DMV failed to rectify Petrosky's primary concern—a set routine and schedule that permitted her to work while affording her the opportunity to take the regular breaks she needed to manage her diabetic condition properly. While DMV was not obligated to provide Petrosky the exact accommodation she requested, *see Querry v. Messar*, 14 F.Supp.2d 437, 445 (S.D.N.Y.1998), a question exists as to the reasonableness of DMV's actions.

■ The fourth element requires proof that Petrosky's termination occurred because of her disability. On a motion for summary judgment Petrosky's burden on this issue is light. *Johnson v. New York Hosp.*, No. 97–Civ.–7089, 1998 WL 851609, at *9 (S.D.N.Y. Dec. 9, 1998); *Meling v. St. Francis College*, No. 95–CV–3739, 1997 WL 1068681, at *6 (E.D.N.Y. Apr. 1, 1997). The record reflects that Petrosky's supervisors and coworkers were upset by realignments made in the work schedule to accommodate Petrosky. Petrosky Aff., ¶¶ 72–73. Negative comments directed at a person's disability can, when combined with other evidence, support an inference that the adverse employment action was taken on the basis of the employee's disability. *See McKeever v. New York Med. College*, No. 96–Civ.–7066, 1999 WL 179376, at *5 (S.D.N.Y. Mar. 31, 1999); *see also Higgins v. New Balance Athletic Shoe, Inc.*, 21 F.Supp.2d 66, 72 (D.Me. 1998) (plaintiff's failure to demonstrate evidence of hostility toward disability defeated her ability to satisfy fourth element). The evidence here includes a letter Petrosky received regarding her termination discussing her disability and DMV's inability to accommodate her to her satisfaction. Petrosky Aff., Ex. O. This suffices to meet Petrosky's light burden on this element.

Questions of fact exist as to Petrosky's prima facie case of discrimination under the ADA and the HRL. The law permits defendants to rebut Petrosky's prima facie case by offering a non-discriminatory justification for her termination. *See Powers v. Polygram Holding, Inc.*, 40 F.Supp.2d 195, 198 (S.D.N.Y.1999). However, this affords no basis for summary judgment here as defendants have offered no such justification. Accordingly, defendants' motion for summary judgment on Petrosky's ADA and HRL claim is denied.

15. The ADA itself provides that reasonable accommodations may include "part-time or modified work schedules." 42 U.S.C. § 12111(9)(b); *see also Lyons*, 68 F.3d at 1515; *Quintana v. Sound Distrib. Corp.*, No. 95–Civ.–309, 1997 WL 40866, at *6 (S.D.N.Y. Feb. 3, 1997).

## 2. Equal Protection and Section 1983

■ "Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (citing 42 U.S.C. § 1983). A section 1983 plaintiff, therefore, bears the burden of establishing the violation of a federally protected constitutional or statutory right which was the result of state action, or action "under color of law." *Annis*, 136 F.3d at 245; *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir.1994). In her fourth cause of action, Petrosky contends that defendants unlawfully discriminated against her in violation of the Equal Protection Clause of the Fourteenth Amendment on the basis of her disability as well as her gender

Whether disability discrimination gives rise to a section 1983 claim "is not a settled question of law in this circuit." *Campbell v. City Univ. Constr. Fund*, No. 98–Civ.–5463, 1999 WL 435132, at *5 (S.D.N.Y. June 25, 1999). Most courts considering the question, however, have found that the Equal Protection Clause does indeed protect individuals from discrimination based on disability and that section 1983, therefore, is a proper vehicle by which to seek relief. *See Hamlyn v. Rock Isl. County Metro. Mass Transit Dist.*, 986 F.Supp. 1126, 1132 (C.D.Ill. 1997); *Davoll v. Webb*, 943 F.Supp. 1289, 1301–02 (D.Colo.1996).

■ The basic command of the Equal Protection Clause is that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *Latrieste Restaurant v. Village of Port Chester*, 188 F.3d 65, 69 (2d Cir.1999). Discrimination based on a suspect or quasi-suspect classification such as race, alienage, ethnicity, or gender is subject to heightened constitutional scrutiny. *See generally United States v. Virginia*, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996); *City of Cleburne*, 473 U.S. at 440–41, 105 S.Ct. 3249; *Able v. United States*, 155 F.3d 628, 631–32 (2d Cir.1998). When the classification is based neither on a suspect class nor implicates a fundamental constitutional right, it is subject to rational basis analysis. *F.C.C. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Griffin v. Mann*, 156 F.3d 288, 291 (2d Cir.1998). Under this test the "classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (citing cases).

■■ Disability is not a suspect class and differences in treatment based on disability are constitutional provided they have a rational basis. *Coolbaugh v. State of La.*, 136 F.3d 430, 433 n. 1 (5th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998) (citing cases); *Modderno v. King*, 82 F.3d 1059, 1062 n. 3 (D.C.Cir.1996); *Manzi v. DiCarlo*, 62 F.Supp.2d 780, 795 (E.D.N.Y.1999); *see also Story v. Green*, 978 F.2d 60, 64 (2d Cir.1992) (noting in dicta that disability is not a suspect or quasi-suspect classification); Pl.Mem. of Law, p. 19 (conceding that rational basis analysis applies). Under rational basis analysis a classification must be "upheld against equal protection challenge if there is any reasonably conceivable set of facts that could provide a rational basis for the classification." *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096.

■ "The rational basis standard has two prongs: (1) the challenged action must have a legitimate purpose and (2) it must have been reasonable for the lawmakers to believe that use of the classification would promote that purpose." *Benjamin v. Town of Fenton*, 892 F.Supp. 64, 67 (N.D.N.Y.1995) (Scullin, J.) (quoting *New York City Managerial Employees Assoc. v. Dinkins*, 807 F.Supp. 958, 965 (S.D.N.Y.

1992)). With respect to her disability claim Petrosky alleges, *inter alia,* that defendants subjected her to ridicule· because of her disability and responded differently to her requests for medical leave than to those of her non-disabled co-workers. While the defendants burden under rational basis analysis is not onerous, there is no readily apparent legitimate governmental reason for the conduct alleged here nor have defendants advanced any such reason. This alone raises sufficient questions of fact to defeat the motion.

Accordingly, defendants' motion for summary judgment on Petrosky's section 1983 claim alleging disability discrimination is denied.[16]

### C. Retaliation Claims

The second and sixth causes of action in Petrosky's amended complaint assert claims for retaliation in violation of Title VII and the HRL. Retaliation claims brought under Title VII are evaluated under the burden shifting rules established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Richardson,* 180 F.3d at 443; *Reed v. A.W. Lawrence & Co. Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996). On a motion for summary judgment this standard requires Petrosky first to establish a prima facie case of retaliation. The defendants then have the burden of presenting a legitimate, non-retaliatory justification for their conduct. If defendants satisfy that burden, Petrosky must produce sufficient proof from which a reasonable juror could conclude that defendants' proffered reason was a mere pretext for retaliation. *Id.* The same standard applies to Petrosky's state law retaliation claim. *Coffey v. Dobbs Int'l Servs., Inc.,* 170 F.3d 323, 326 (2d Cir. 1999); *Sowemimo,* 43 F.Supp.2d at 487 n. 3.

Defendants never mention the retaliation claims in their motion papers. On that ground alone, therefore, summary judgment should be denied as to these claims because the failure to discuss the claims means, of necessity, that defendants have not met their initial burden of demonstrating that no question of fact exists with respect to those claims.

In the alternative, however, questions of fact exist as to these claims. Petrosky's prima facie case requires her to demonstrate that 1) she was engaged in protected activity of which defendants were aware, 2) she was the victim of a disadvantaging employment action, and 3) a causal connection existed between the protected activity and the adverse action. *Richardson,* 180 F.3d at 443; *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999). Petrosky's complaints regarding her workplace environment are protected conduct, *see Querry,* 14 F.Supp.2d at 450–51, and her termination constitutes an adverse employment action. The only question then is whether she has offered evidence of a causal connection between the two.

> A causal connection can be demonstrated indirectly by showing that the protected activity was followed closely in time by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.

*Stephens v. State Univ. of N.Y. at Buffalo,* 11 F.Supp.2d 242, 250 (W.D.N.Y.1998) (citing cases). Petrosky's complaint to the EEOC was dated March 22, 1995. Docket No. 46, Ex. B. She received notice of her termination in a May 19, 1995 letter. Petrosky Aff., Ex. O. Under certain circumstances, proximity between a complaint and the adverse employment action can establish the existence of a causal connection between the two. *Brown,* 41

---

**16.** Defendants also contend that they are entitled to qualified immunity with respect to Petrosky's section 1983 claims. Defs.Mem. of

Law, p. 29. The questions of fact discussed above compel denial of defendants' motion on this ground.

F.Supp.2d at 186. A two month gap is sufficiently close in time for the inference to be properly drawn. *See Quinn*, 159 F.3d at 769; *Meckenberg v. New York City Off–Track Betting*, 42 F.Supp.2d 359, 382 (S.D.N.Y.1999); *Kotlowski v. Eastman Kodak Co.*, 922 F.Supp. 790, 802 (W.D.N.Y. 1996).

Having met the burden of demonstrating a prima facie case, Petrosky shifts the burden to defendants to offer a non-retaliatory explanation for her termination. *See Donato v. Plainview–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996). Defendants have failed to offer any reason for Petrosky's termination and cannot satisfy their burden on this point. Accordingly, defendants' motion for summary judgment on Petrosky's retaliation claims is denied.

### D. Other Contentions

### 1. State Action under Section 1983

■ The first element that Petrosky must establish for her section 1983 claim is state action. State action "requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (internal quotation omitted); *see also Annunziato v. The Gan, Inc.*, 744 F.2d 244, 249 (2d Cir.1984). Defendants contend that Harris and Hass were merely co-workers of Petrosky and cannot as a matter of law be deemed state actors. Defs.Mem. of Law, pp. 23–25.[17] "Mere employment by a state ... does not automatically mean that a defendant's ac-

tions are taken under the color of state law." *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir.1996) (citing *Polk County v. Dodson*, 454 U.S. 312, 319–20, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)); *see also Buzzi v. Gomez*, 24 F.Supp.2d 1352, 1359 (S.D.Fla.1998) ("Government employment alone, however, is insufficient."). Other courts have rejected the contention that co-worker harassment was done under color of law "when the harassment did not involve use of state authority or position." *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir.1992) (citing cases). The dispositive test appears to be whether the defendants acted pursuant to power they possessed by state authority. *Edwards v. Wallace Community College*, 49 F.3d 1517, 1523 (11th Cir.1995).[18]

■ Under this standard, Hass was not acting under color of law and cannot be liable under section 1983. He was merely a state employee, coequal with Petrosky, and lacked any power either to compel her to act or to take official action against those who might harass her. *See Quinn v. Nassau County Police Dep't*, 53 F.Supp.2d 347, 354–55 (E.D.N.Y.1999). Harris, however, served as Senior Firearms Instructor and Chief Range Officer for DMV. Harris Dep. (Docket No. 52), pp. 140–41. In that capacity he exercised authority over Petrosky's ability to receive weapons training. Petrosky has offered evidence that Harris misused this authority because of gender and disability. Petrosky Aff., ¶¶ 79–80. This suffices to raise a question of fact as to Harris' state action.

---

**17.** It is clear that Petrosky does not state a claim against DMV under section 1983 because a claim against a state agency is construed as one against the state, *Schallop v. New York State Dep't of Law*, 20 F.Supp.2d 384, 390 (N.D.N.Y.1998) (citing cases). The state is not a "person" within the meaning of section 1983 and cannot be sued under that statute. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

**18.** Even those cases that have found co-worker harassment actionable have noted that the true state action test is whether the harassment resulted from power conferred on the co-worker by the state. *See, e.g., Anthony v. County of Sacramento, Sheriff's Dep't*, 845 F.Supp. 1396, 1401 (E.D.Cal.1994) (co-worker harassment actionable "when the abuse is related to state-conferred authority or duties").

■ The remaining individual defendants were Petrosky's supervisors. They were endowed by the state with certain authority over her and were in a position to act to stop the harassment she alleged. As such, their actions or inactions with respect to those claims "involve[d] use of state authority or position," *Woodward*, 977 F.2d at 1400, and each, therefore, was a state actor. *Annis*, 36 F.3d at 254 (supervisor acts under color of law); *Quinn v. Nassau County Police Dep't*, 1999 WL 450863, at *6–7.

Accordingly, the motion for summary judgment on Petrosky's section 1983 claims is granted as to Hass on the ground that his actions were not taken under color of state law and denied as to the remaining individual defendants.

## 2. Personal Involvement

■ Also essential to a section 1983 claim is that the individual defendant be personally involved in the alleged constitutional deprivation. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994). Defendants contend that Milner, Schwabrow, Achcet, and Dwyer lacked the necessary personal involvement and cannot be liable under section 1983. Such supervisory personnel may be "personally involved" in several ways, including direct personal participation or the failure to remedy a wrong of which they are aware. *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986).

■ Petrosky alleges that Dwyer gave her an oral examination during a job interview, though other applicants were not given such an examination, simply in an attempt to prevent her from getting the job, while maintaining the appearance that DMV was attempting to accommodate Petrosky's disability. Petrosky Aff., ¶ 91. With respect to her gender claim, Petrosky alleges that Dwyer maintained a long-

standing animus toward her that prejudiced his conduct. *Id.* at ¶ 90. Milner was Petrosky's supervisor and the defendant involved in the October 20, 1994 incident. Petrosky also alleges that despite reduced hours, Milner gave her the same amount of work as other investigators. *Id.* at ¶ 70.

As to Schwabrow, Petrosky alleges that he gave her added work by requiring her to train a new investigator despite her requests for accommodations. She alleges Schwabrow then told her that he did not want to hear any complaints about the trainee's use of vulgar language. *Id.* at ¶ 66. Petrosky alleges that Achcet was aware of the problems Petrosky faced at the OFI garage but failed to take appropriate steps to prevent them. *See id.* at ¶¶ 44, 53 & 56.

Therefore, Petrosky has raised issues of fact whether each of these supervisory defendants was either a direct participant in the discrimination or was aware of it based on Petrosky's complaints but failed to act. Nothing more is required for personal involvement and none of these defendants are entitled to summary judgment on this ground.

## 3. Individual Liability under the HRL

■ Defendants contend that none of the individual defendants may be liable under the HRL because none was Petrosky's "employer" as that term is defined in the statute. Defs. Reply Mem. of Law, pp. 9–10. Petrosky contends that each may be liable as an aider or abettor pursuant to section 296(6).[19] Defendants rely principally on the New York Court of Appeals decision in *Patrowich v. Chemical Bank* which held that individuals are not subject to liability under section 296 unless they have an "ownership interest or any power to do more than carry out personnel decisions made by others." 63 N.Y.2d 541, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984).

---

**19.** That statute provides: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the do-

ing of any of the acts forbidden under this article, or to attempt to do so."

*Patrowich,* however, offers little support for defendants' argument because it neither considered nor cited the subdivision six aider and abettor language.

Several courts have concluded that the aider and abettor language cannot be utilized to expose co-workers to liability because to do so would unduly broaden the scope of the HRL. *Falbaum v. Pomerantz,* 891 F.Supp. 986, 991–92 (S.D.N.Y.1995); *Trovato v. Air Express Int'l,* 238 A.D.2d 333, 655 N.Y.S.2d 656, 657 (2d Dep't 1997); *Foley v. Mobil Chem. Co.,* 170 Misc.2d 1, 647 N.Y.S.2d 374, 380–81 (Sup.Ct.1996). Defendants cite each case in support of their argument. The Second Circuit, however, has expressly held that the aider and abettor provision supplies a basis for liability for individual co-workers. *Tomka,* 66 F.3d at 1317. Prior to *Tomka,* several district courts had reached the same conclusion. *See, e.g., Poulsen v. City of North Tonawanda, N.Y.,* 811 F.Supp. 884, 900 (W.D.N.Y.1993) (citing cases). Numerous other federal courts have since found *Tomka* controlling and have permitted the aider and abettor theory to proceed. *See, e.g., Oliver v. General Nutrition Ctr.,* No. 97–Civ.–6800, 1999 WL 435208, at *3 n. 6 (S.D.N.Y. June 25, 1999) (citing cases); *Kojak v. Jenkins,* No. 98–CV–4412, 1999 WL 244098, at *6–7 (S.D.N.Y. Apr. 26, 1999); *Sowemimo v. D.A.O.R. Sec., Inc.,* 43 F.Supp.2d 477, 487 (S.D.N.Y.1999). Nor, as defendants concede, is the issue resolved in the New York state courts. While the Second Department has rejected the aider and abettor theory, the First Department has embraced it and permitted such claims. *See Steadman v. Sinclair,* 223 A.D.2d 392, 636 N.Y.S.2d 325, 326 (1st Dep't 1996); *Peck v. Sony Music Corp.,* 221 A.D.2d 157, 632 N.Y.S.2d 963 (1st Dep't 1995).

Defendants suggest that *Tomka* has been called into "grave doubt" by the *Trovato* and *Foley* decisions which they contend are the "most authoritative" because they are state court interpretations of state law. Defs. Reply Mem. of Law, p. 10. Defendants' argument is not persuasive. First, the most important precedential authority presented is that from the Second Circuit as this Court is bound by its decisions of law. *Kojak,* 1999 WL 244098, at *7 ("this Court is bound by the Second Circuit's holding in *Tomka* "). More important is the fact that the state courts themselves are divided and thus, while *Tomka* may be subject to criticism, there is no basis on which to find that it was improperly decided. Indeed, the vast majority of federal courts to have considered the question have followed *Tomka. See Oliver,* 1999 WL 435208, at *3 n. 6 (citing cases).

Accordingly, *Tomka* and the vast majority of federal authorities following it govern here and defendants motion for summary judgment with respect to the individual defendants is denied.[20]

## IX. Conclusion

**WHEREFORE,** for the reasons stated above, it is hereby **ORDERED** that:

1. Petrosky's second amended complaint (Docket No. 60) is **STRICKEN** from the record;

2. Defendants' motion for summary judgment is:

A. **GRANTED** as to Petrosky's first cause of action (sex discrimination in violation of Title VII) in its entirety;

B. **GRANTED** as to Petrosky's claim of sex discrimination in her fourth cause of action (section 1983) and her fifth cause of action (sex discrimination in violation of

---

**20.** Defendants suggest that this Court should decline to exercise supplemental jurisdiction over the state law claims because of the conflict in state authority. This would permit the issue to be later resolved in state court. *See Ponticelli v. Zurich Am. Ins. Group,* 16

F.Supp.2d 414, 439–40 (S.D.N.Y.1998). However, given the weight of federal authority supporting Petrosky's theory and the interest in resolving related claims in one proceeding, the request to decline supplemental jurisdiction is rejected.

66

the HRL) as to events alleged to have occurred prior to June 6, 1993; and

C. **GRANTED** as to Petrosky's fourth cause of action (section 1983) against defendant Hass; and

D. **DENIED** in all other respects; and

**IT IS FURTHER ORDERED** that the Clerk of the Court serve a copy of this order, by regular mail, upon all parties to this action.

**IT IS SO ORDERED.**